UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| STELLA SATTER,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>WASHINGTON STATE DEPARTMENT OF ECOLOGY, et al.,<br><br>　　　　　Defendants. | CASE NO. C09-5409BHS<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT |

This matter comes before the Court on Defendants' Motion for Partial Summary Judgment Re Prior Restraint Claim. Dkt. 12. The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby grants Defendants' motion for the reasons stated herein.

**I. PROCEDURAL HISTORY**

On September 29, 2009, Plaintiff Stella Satter ("Satter") filed a complaint against Defendants in Thurston County Superior Court. Dkt. 1-3. In her complaint, Satter alleges that: (1) Defendant Ken Slattery ("Slattery"), under color of state law, violated her rights under the United States Constitution by creating a prior restraint to her ability to engage in free speech about matters that potentially could be of public concern (Dkt. 1-3 at 17-18 ¶ 4.2); (2) Defendant Polly Zehm ("Zehm"), under color of state law, violated

ORDER - 1

Satter's rights under the United States Constitution by retaliating against Satter because of the content of Satter's response to a personnel investigation (*Id*. at ¶ 4.3); (3) Slattery, under color of state law, violated Satter's rights under the United States Constitution by retaliating against her because of the content of her response to a personnel investigation; and (*id*. at ¶ 4.4); and (4) Defendant Washington State Department of Ecology ("DOE"), through its agents and employees, wrongfully terminated Satter in violation of public policy under Washington State law (*id*. at ¶ 4.5). The Court has entered orders (Dkts. 48 & 55) granting the parties' stipulations to dismissal of the claims contained in paragraphs 4.3 and 4.4 of Satter's complaint.

On April 6, 2010, Defendants filed their motion for partial summary judgment regarding Satter's prior restraint claim. Dkt. 12. On April 26, 2010, Satter responded (Dkt. 27) and on April 30, 2010, Defendants replied (Dkt. 34).

## II. FACTUAL BACKGROUND

Unless otherwise indicated, the following facts are undisputed:

Satter was an employee of DOE from December of 1987 until June of 2007. Dkt. 28 at 1. As of 2005, Satter was the Information Management Section Manager in the Water Rights Program. Dkt. 28 at 2. Slattery was the Manager of the Water Rights Program and was Satter's direct supervisor. *Id*.; Dkt. 14 at 2. Kelly Slattery, Slattery's daughter, worked for DOE at the Bellingham Field Office and reported to Satter. Dkt. 28 at 2. Linda Ashborn ("Ashborn") worked in the Information Management Section at DOE and was directly supervised by Satter. *Id*.

On March 9, 2007, Slattery was informed that Ashborn wanted to meet with him outside the office to talk about possible misconduct of her supervisor. *Id*. Slattery met with Ashborn, along with his secretary Jolynne Anderson ("Anderson"), at a coffee shop that afternoon. *Id*. Ashborn and Slattery discussed Ashborn's complaints related to possible work-related misconduct and ethical violations on the part of Satter. *Id*. at 3. Ashborn provided Slattery with a three-page written statement of her complaints the

ORDER - 2

following week. *Id*. & Exh. 1.  Ashborn's written statement contained twenty-three numbered paragraphs describing in detail her allegations of Satter's misconduct.  *Id*.  The allegations consisted of multiple situations in which Satter was a distraction to Ashborn, other Information Management Section employees, and disruptive to the workplace in general, as well as several instances in which Satter was dishonest in using DOE resources.  *See id*.

Slattery had some concern about Ashborn's credibility in making the allegations against Satter, but felt it would be inappropriate to completely ignore her complaints.  Dkt. 14 at 3.  Over the weekend following his meeting with Ashborn, Slattery contacted his direct supervisor, Zehm, Deputy Director of DOE, for guidance on how to handle Ashborn's complaints.  *Id*.  He informed Zehm that her complaints consisted of potentially serious allegations of misconduct by her supervisor Satter.  *Id*.  Zehm directed Slattery to speak with human resource professionals within DOE's Employee Services Section and to keep her informed of the ongoing process.  *Id*. at 3-4.  Zehm also informed Slattery that he should not give her specific details as she may need to act as a decision-maker on the allegations in the future.  *Id*.

On March 12, 2007, Slattery met with Misty Reese ("Reese"), the Human Resources Consultant for the Water Resources Program and her supervisor, Michael South ("South"), DOE's Labor Relations Manager.  *Id*. at 4.  They reviewed Ashborn's allegations against Satter and agreed that the allegations were serious enough to warrant a meeting with Joy St. Germain ("St. Germain"), Director of Employee Services, to discuss how to proceed.  *Id*.

Later that day, Slattery, Reese, and South met with St. Germain to discuss Ashworth's allegations.  They reviewed Ashworth's written statements and although they shared a concern about her credibility, they agreed that they could not ignore her allegations and jump to any conclusions without knowing the facts.  *Id*.  They were also concerned about conducting an investigation with potential witnesses within the DOE

ORDER - 3

1  Information Management Section if the employees felt that they might be retaliated
2  against for saying things about Satter. *Id*. They agreed that, under the circumstances, the
3  only way to proceed was to reassign Satter to her home with full pay and instruct her not
4  to contact DOE employees during the investigation and hire an independent third party to
5  investigate the allegations. *Id*. According to Slattery, "[t]his approach was intended to
6  allow the Department to conduct an efficient, impartial investigation, respect the
7  employment rights of everyone involved (including Ms. Satter), and minimize disruption
8  to the workplace." *Id*. at 4-5. They also agreed that a certified letter would be sent to
9  Satter to inform her of the reassignment. *Id*. at 5. Following the meeting, South drafted a
10 letter dated March 13, 2007, regarding the reassignment, to send to Satter. *Id*. Slattery,
11 as South's direct supervisor, signed the letter. *Id*. & Exh. 2. In relevant part, the letter
12 stated that during the reassignment, Satter was "not to contact any [DOE] employee or
13 discuss the circumstances regarding [her] reassignment with any [DOE] employee." Dkt.
14 14, Exh. 2.
15        On March 13, 2007, Slattery and Reese met with Satter at 9:00 a.m. in Slattery's
16 office. *Id*. at 5. Slattery verbally informed Satter of the reassignment and went over the
17 directions in the letter, and gave her a copy of the letter. *Id*. Satter asked Slattery what
18 the allegations against her were and he told her that he was not allowed to tell her, but
19 that she would be contacted as the investigation progressed. *Id*. Slattery escorted Satter
20 to her office to gather her belongings that she wanted to take home with her and then to
21 the parking garage. *Id*. Later that day, Slattery met with employees from the Information
22 Management Section to advise them of Satter's reassignment pending the investigation
23 into possible misconduct. *Id*. at 6. He informed them that a third party was being hired to
24 investigate the allegations and that they were required to cooperate with the investigation
25 and tell the truth when asked questions. *Id*. He also told them that Satter had been
26 instructed not to contact any DOE employees and that if she attempted to do so, they were
27 to contact him immediately. *Id*.
28

1    At approximately 11:00 a.m. on March 13, 2007, Slattery was informed that Satter had allegedly called Ashborn's cell phone since Satter had been escorted out of the building.  *Id*. at 6.  Slattery spoke with South about the incident, and Slattery called Satter and again instructed her not to contact any DOE employees during the reassignment.  *Id*. at 6-7.

On April 4, 2007, Slattery spoke with Satter and told her that an investigator had been hired.  Dkt. 28 at 6.  On April 5, 2007, Slattery informed Satter that she was to meet with the investigator the following day to answer some questions.  *Id*.  During this telephone conversation, Satter asked Slattery if she would find out what the allegations against her were at the meeting with the investigator.  *Id*.  According to Satter, Slattery told her that the investigator would have the allegations and some questions for her.  *Id*.  After several meetings with the investigator and conversations with Slattery, Satter learned of the allegations against her when she received the investigator's final report and supporting documentation on or about May 26, 2007.  *Id*. at 7-8.  The day before she learned of the allegations, Satter received, by certified mail, notice of a pre-disciplinary "*Loudermill* hearing" set for June 14, 2007.  *Id*. at 8.

Satter prepared a twenty-six-page response in preparation for the *Loudermill* hearing in which she responded to the allegations against her as well as accused Slattery of retaliating against her for her involvement in supervising his daughter Kelly Slattery and alleged misuse of public funds, wastefulness, and inefficiency on the part of DOE. Dkt. 29, Exh. 8.

The following facts are the recitation of events following Satter's submission of her *Loudermill* response, as they appear in her complaint:

After arriving at the hearing on June 14, 2007, Satter saw that Slattery and Reese were present.  Dkt. 1 at 14.  According to Satter, she knew that because they were present she was not going to receive a fair hearing and she presented a previously prepared resignation letter that was effective at 4:00 p.m. on June 15, 2007.  *Id*.  On June 14, 2007,


Zehm accepted Satter's resignation letter. *Id*. At approximately 10:00 a.m. on June 15, 2007, Satter submitted a notice of rescission of her resignation letter to Zehm. *Id*. at 15. At approximately 3:00 p.m. that same day, Satter received a voicemail from Reese stating that Zehm would not permit the rescission of her resignation letter. *Id*.

### III. DISCUSSION

**A.   Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The

nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*. Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

**B.    Motions to Strike**

In their reply (Dkt. 34), Defendants set forth several motions to strike evidence submitted by Satter in support of her response to the motion (Dkt. 27). Dkt. 34 at 7, fns. 8 & 9.

First, Defendants' motion to strike portions of Satter's declaration as irrelevant is denied. In deciding Defendants' motion for summary judgment, the Court considers the facts in the light most favorable to Satter, the non-moving party, and will take into account any relevant evidence. *See* F.R.C.P. Rule 403. Thus, the Court will consider Satter's entire declaration, but also considers the declarations (Dkts. 20-23 & 33) that were noted by Defendants in this motion to strike.

Second, Defendants' motion to strike Satter's contention regarding bringing her complaint to the Director of DOE (Dkt. 28 at 9) is granted as this contention contradicts her prior sworn testimony and she gives no explanation for this discrepancy. *See* Dkt. 28 & Dkt. 35 at 6-8.

Third, Defendants' motion to strike Exhibits 6 and 7 to Satter's declaration is granted as these exhibits are irrelevant to the Court's determination of this motion for partial summary judgment and constitute unsworn documents and contain unauthenticated hearsay in violation of Rules 802 and 901 of the Federal Rules of Evidence.

Finally, Defendants' motion to strike Exhibits 2, 5-7, and 10-11 to attorney Hugh J. McGavick's declaration (Dkt. 29) is granted as he has demonstrated no personal knowledge to authenticate the documents contained in these exhibits. *See* F.R.C.P. Rule 56(e).

ORDER - 7

**C.   Prior Restraint Claim**

State employees do not relinquish their First Amendment rights to speak on matters of public concern simply because they work for the government. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). However, as an employer, the government has interests in regulating the speech of its employees that differ significantly from those it has with regard to its citizens in general. *Id*. Therefore, "the problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id*.

**1.   Speech on Matters of Public Concern**

Under *Pickering*, the threshold inquiry in cases involving an alleged prior restraint of a public employee's speech is whether the prior restraint prohibits speech on matters of public concern. *Gibson v. Office of Att'y Gen.*, 561 F.3d 920, 926-27 (9th Cir. 2009). Courts are to define the scope of the public concern element broadly. *Desrochers v. City of San Bernardino*, 572 F.3d 703, 710 (9th Cir. 2009). To be of public concern, the speech "must involve issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *Id*. at 710 (internal citations and quotation marks omitted).

Here, the letter containing the prior restraint stated that Satter was "not to contact any [DOE] employee or discuss the circumstances regarding [her] reassignment with any [DOE] employee . . . ." Dkt. 14, Exh. 2. Thus, the only specific restraint on the content of Satter's speech was that she was not to discuss her reassignment with DOE employees. This is clearly not a matter of public concern. *See Desrochers*, 572 F.3d at 710 (stating that "speech that deals with individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of the performance of governmental agencies is generally not of public concern" (internal quotation marks omitted)). However, the letter also indicated that, regardless of what she wanted to speak about, she

ORDER - 8

was not allowed to talk to certain people, i.e. DOE employees. *Id.* Satter argues that this part of the letter constitutes a prior restraint in violation of her First Amendment rights because it restrained all speech directed towards DOE employees, essentially including matters of public concern. Dkt. 27 at 9-10. These matters of public concern, according to Satter, included allegations of misuse of public funds, wastefulness, and inefficiency on the part of DOE. *See* Dkt. 28 at 9; Dkt. 29 at Exh. 8.

Defendants argue that the letter was not a prior restraint of speech involving matters of public concern because Satter was free to express such matters to the public, including the media, public officials, or anyone on the street, as long as she didn't speak with DOE employees. Dkt.12 at 6-7 (citing to Satter's deposition (Dkt. 13 at 15-16)). According to DOE, this was proper as the restraint was intended to prevent Satter from discussing personnel matters, including the reassignment of her work location, with fellow employees during the investigation into allegations against her of work-related misconduct and ethical violations. Dkt. 12 at 9-10.

The Court concludes that the limitation on Satter's speech to any DOE employee constitutes a prior restraint of possible matters of public concern. The Court finds that DOE's position that the restraint was narrowly tailored to keep Satter from discussing personnel issues with fellow employees is an issue to be addressed below in balancing DOE's interests with Satter's First Amendment rights.

**2. Employer's Interests vs. First Amendment Rights**

Under *Pickering*, once a court has determined that the speech at issue is a matter of public concern, the "second inquiry questions whether, using a balancing test, the public employer can demonstrate that its legitimate interests outweigh the employee's First Amendment rights." *Gibson*, 561 F.3d at 927 (citing *Hudson v. Craven*, 403 F.3d 691, 696 (9th Cir. 2005)). In *Robinson v. York*, 566 F.3d 817, 824 (9th Cir. 2009), the Ninth Circuit held that for a court "to find that the government's interest as an employer in a smoothly-running office outweighs an employee's first amendment right, defendants

must demonstrate actual material and substantial disruption, or reasonable predictions of disruption in the workplace." (internal quotation marks omitted).

Here, Satter asserts that, under *Robinson*, Slattery's fear of disruption is neither a valid nor persuasive argument in defending the prior restraint. Dkt. 27 at 14. Further, she quotes *Allen v. Scribner*, 812 F.2d 426, 432 (9th Cir. 1987), in stating that "[a]n undeservedly anticipated 'disruption exception cannot serve as a pretext for stifling legitimate speech or penalizing public employees for expressing unpopular views.'" Dkt. 27 at 14 (internal quotation marks omitted). Further, Satter argues that there are genuine issues of material fact regarding the extent of office disruption and that the Court should deny Defendants' motion for summary judgment on this basis. Dkt. 27 at 13.

Defendants maintain that they had a legitimate interest "in conducting an efficient, impartial investigation into [Satter's] alleged work-related misconduct and minimizing disruption to the workplace related thereto." Dkt. 12 at 11. Thus, the instruction given to Satter that she not contact any DOE employee was narrowly tailored to the circumstances in that Satter was only restricted in her speech as to fellow employees and that the instruction was given as part of the investigation process, rather than a rule or policy of general applicability. *Id*. Therefore, Defendants argue that their interest in conducting a proper investigation into Satter's conduct and minimizing workplace disruption outweighs her First Amendment rights to speak to fellow employees. *Id*. at 12.

In an attempt to conduct a personnel investigation, Slattery and the other DOE employees involved in initially evaluating Ashborn's allegations agreed that "instructing Ms. Satter not to contact other employees during the investigation was the only way to proceed under the circumstances." Dkt. 14 at 4. The Court's job is not to decide whether the restriction on Satter's speech was in fact the only way to proceed. Rather, the Court's job is to decide whether such restriction was reasonable to effectuate their interests in light of the circumstances and whether these interests outweigh Satter's. The Court concludes that they do. Defendants' instruction was a narrowly-tailored restriction

ORDER - 10


intended to prevent reasonably predicted workplace disruptions. *See Robinson*, 566 F.3d at 824. Defendants received multiple serious allegations from Ashworth regarding Satter's work-related conduct. Dkt. 14 at 2-3 & Exh. 1. While Defendants admit that they had concerns about Ashworth's credibility, they concluded that they could not simply ignore them without a proper investigation. Dkt. 14 at 3. Defendants' predictions that a disruption would occur if they conducted an investigation of Satter's possible unethical conduct in her presence or allowed her to contact fellow employees during such an investigation, were reasonable. This investigation included interviewing several employees that were under Satter's direct supervision. *Id*. at 4-5. Moreover, Defendants' investigation was based on allegations that specifically included situations of workplace disruption caused by Satter. *See, e.g.*, Dkt. 14, Exh. 1 ¶ 3 (Ashborn's written complaint stating that "[a] large amount of my work time is taken by [Satter] dragging me off to listen to her bad mouth other staff in Water Resources and to be told that I can not trust them. I estimate 4 hrs a day 3 days a week.").

While Satter's First Amendment rights are of utmost importance, Defendants did not restrict her from exercising those rights with the exception of speaking to DOE employees and even then, only intended the restriction to last until the investigation was completed. Dkt. 12 at 11. Satter could have voiced her concerns about DOE's inefficiency, misuse of public funds, and wastefulness to the governor, another public official, or the media. Dkt.12 at 6-7 (citing to Satter's deposition (Dkt. 13 at 15-16)). Moreover, unlike the defendants in *U.S. v. National Treasury Employees Union*, 513 U.S. 454, 468 (1995), a case cited to by Satter, here, Defendants did not issue a rule or policy limiting her free speech. *See id*. (involving a statute passed by Congress that limited government employees' speech). Instead, Defendants imposed a specific restriction on who she could speak to, pending the investigation into her workplace conduct. Dkt. 14 at 5 & Exh. 2. Accordingly, the Court concludes that Defendants' legitimate interests in conducting an investigation and preventing workplace disruption outweigh Satter's rights.

ORDER - 11

### D. Qualified Immunity

The doctrine of qualified immunity is a protection for public officials from liability for civil damages insofar as their conduct does not violate a clearly established constitutional right. *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009). In order for a right to be clearly established, it "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Ninth Circuit has held that, for claims of First Amendment violations analyzed under *Pickering*, "[b]ecause the underlying determination pursuant to *Pickering* whether a public employee's speech is constitutionally protected turns on a context-intensive, case-by-case balancing analysis, the law regarding such claims will rarely, if ever, be sufficiently 'clearly established' to preclude qualified immunity." *Moran v. State*, 147 F.3d 839, 844 (9th Cir. 1982). Although cases analyzed under *Pickering* will not, as a general matter, generate clearly established law, this does not excuse courts from analyzing each case on its own merits. *Id*.

Here, as discussed above, the Court has concluded that Defendants' restriction did not violate Satter's First Amendment rights because, under *Pickering*, Satter's rights were outweighed by Defendants' interests. *See supra* Section III.C.2. In the alternative, if the Court would have found that Satter's rights were violated, the question left under the qualified immunity doctrine would be whether this right was clearly established in that a reasonable public official would have understood that the restriction violated her right. *Anderson*, 483 U.S. at 640. The Court's answer to this inquiry is clearly no. First, this Court has concluded that the restriction did not violate Satter's rights. Moreover, as the Ninth Circuit explained in *Moran*, most cases involving the *Pickering* balancing test are inherently close cases. 147 F.3d at 844. Courts must weigh a plaintiff's constitutional rights with an employer's right to manage an efficient workplace. Even if, after balancing the interests and the surrounding circumstances, the Court would have come to the conclusion that Defendants' restriction violated Satter's rights, a reasonable public

ORDER - 12

official would not be expected to know that such conduct violated her constitutional rights. Qualified immunity is designed to protect "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Here, Slattery's decision to impose the restriction is clearly protected by the qualified immunity doctrine.

## IV. ORDER

Therefore, it is hereby

**ORDERED** that Defendants' motion for partial summary judgment (Dkt. 12) is **GRANTED**.

DATED this 8th day of June, 2010.

_____
BENJAMIN H. SETTLE
United States District Judge

ORDER - 13