1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

STELLA SATTER,

                       Plaintiff,

      v.

WASHINGTON STATE DEPARTMENT
OF ECOLOGY, et al.,

                   Defendants.

CASE NO. C09-5645BHS

ORDER GRANTING
DEFENDANT'S MOTION
FOR PARTIAL
SUMMARY JUDGMENT

This matter comes before the Court on Defendant Washington State Department of

Ecology's ("DOE") Motion for Partial Summary Regarding Constructive Discharge

Claim.  Dkt. 60.  The Court has considered the pleadings filed in support of and in

opposition to the motion and the remainder of the file and hereby grants DOE's motion

for the reasons stated herein.

## I. PROCEDURAL HISTORY

On September 29, 2009, Plaintiff Stella Satter ("Satter") filed a complaint against

Defendants in Thurston County Superior Court.  Dkt. 1-3.  In her complaint, Satter

alleges that: (1) Defendant Ken Slattery ("Slattery"), under color of state law, violated her

rights under the United States Constitution by creating a prior restraint to her ability to

engage in free speech about matters that potentially could be of public concern (Dkt. 1-3

ORDER - 1

at 17-18 ¶ 4.2); (2) Defendant Polly Zehm ("Zehm"), under color of state law, violated Satter's rights under the United States Constitution by retaliating against Satter because of the content of Satter's response to a personnel investigation (*Id.* at ¶ 4.3); (3) Slattery, under color of state law, violated Satter's rights under the United States Constitution by retaliating against her because of the content of her response to a personnel investigation (*id.* at ¶ 4.4); and (4) DOE, through its agents and employees, wrongfully terminated Satter in violation of public policy under Washington State law (*id.* at ¶ 4.5). The Court has entered orders (Dkts. 48 & 55) granting the parties' stipulations to dismissal of the claims contained in paragraphs 4.3 and 4.4 of Satter's complaint.

On June 8, 2010, the Court granted Defendants' motion for partial summary judgment regarding Satter's prior restraint claim against Slattery. Dkt. 56. On June 17, 2010, DOE filed the instant motion for partial summary judgment on Satter's constructive discharge claim. Dkt. 60. On July 6, 2010, Satter responded (Dkt. 72) and on July 9, 2010, DOE replied (Dkt. 74).

## II. FACTUAL BACKGROUND

Unless otherwise indicated, the following facts are undisputed:

Satter was an employee of DOE from December of 1987 until June of 2007. Dkt. 28 at 1. As of 2005, Satter was the Information Management Section Manager in the Water Rights Program. Dkt. 28 at 2. Slattery was the Manager of the Water Rights Program and was Satter's direct supervisor. *Id.*; Dkt. 14 at 2. Kelly Slattery, Slattery's daughter, worked for DOE at the Bellingham Field Office and reported to Satter. Dkt. 28 at 2. Linda Ashborn ("Ashborn") worked in the Information Management Section at DOE and was directly supervised by Satter. *Id.*

On March 9, 2007, Slattery was informed that Ashborn wanted to meet with him outside the office to talk about possible misconduct of her supervisor. *Id.* Slattery met with Ashborn, along with his secretary Jolynne Anderson ("Anderson"), at a coffee shop that afternoon. *Id.* Ashborn and Slattery discussed Ashborn's complaints related to

possible work-related misconduct and ethical violations on the part of Satter.  *Id*. at 3.
Ashborn provided Slattery with a three-page written statement of her complaints the
following week.  *Id*. & Exh. 1.  Ashborn's written statement contained twenty-three
numbered paragraphs describing in detail her allegations of Satter's misconduct.  *Id*.  The
allegations consisted of multiple situations in which Satter was a distraction to Ashborn,
other Information Management Section employees, and disruptive to the workplace in
general, as well as several instances in which Satter was dishonest in using DOE
resources.  *See id.*

Slattery had some concern about Ashborn's credibility in making the allegations
against Satter, but felt it would be inappropriate to completely ignore her complaints.
Dkt. 14 at 3.  Over the weekend following his meeting with Ashborn, Slattery contacted
his direct supervisor, Zehm, Deputy Director of DOE, for guidance on how to handle
Ashborn's complaints.  *Id*.  He informed Zehm that her complaints consisted of
potentially serious allegations of misconduct by her supervisor Satter.  *Id*.  Zehm directed
Slattery to speak with human resource professionals within DOE's Employee Services
Section and to keep her informed of the ongoing process.  *Id*. at 3-4.  Zehm also informed
Slattery that he should not give her specific details as she may need to act as a decision-
maker on the allegations in the future.  *Id*.

On March 12, 2007, Slattery met with Misty Reese ("Reese"), the Human
Resources Consultant for the Water Resources Program and her supervisor, Michael
South ("South"), DOE's Labor Relations Manager.  *Id*. at 4.  They reviewed Ashborn's
allegations against Satter and agreed that the allegations were serious enough to warrant a
meeting with Joy St. Germain ("St. Germain"), Director of Employee Services, to discuss
how to proceed.  *Id*.

Later that day, Slattery, Reese, and South met with St. Germain to discuss
Ashworth's allegations.  They reviewed Ashworth's written statements and although they
shared a concern about her credibility, they agreed that they could not ignore her

allegations and jump to any conclusions without knowing the facts.  *Id.*  They were also concerned about conducting an investigation with potential witnesses within the DOE Information Management Section if the employees felt that they might be retaliated against for saying things about Satter.  *Id.*  They agreed that, under the circumstances, the only way to proceed was to reassign Satter to her home with full pay and instruct her not to contact DOE employees during the investigation, and then hire an independent third party to investigate the allegations.  *Id.*  According to Slattery, "[t]his approach was intended to allow the Department to conduct an efficient, impartial investigation, respect the employment rights of everyone involved (including Ms. Satter), and minimize disruption to the workplace."  *Id.* at 4-5.  They also agreed that a certified letter would be sent to Satter to inform her of the reassignment.  *Id.* at 5.  Following the meeting, South drafted a letter dated March 13, 2007, regarding the reassignment, to send to Satter.  *Id.* Slattery, as South's direct supervisor, signed the letter.  *Id.* & Exh. 2.  In relevant part, the letter stated that during the reassignment, Satter was "not to contact any [DOE] employee or discuss the circumstances regarding [her] reassignment with any [DOE] employee." Dkt. 14, Exh. 2.

On March 13, 2007, Slattery and Reese met with Satter at 9:00 a.m. in Slattery's office.  *Id.* at 5.  Slattery informed Satter of the reassignment and went over the directions in the letter, and gave her a copy of the letter.  *Id.*  Satter asked Slattery what the allegations against her were and he told her that he was not allowed to tell her, but that she would be contacted as the investigation progressed.  *Id.*  Slattery escorted Satter to her office to gather her belongings that she wanted to take home with her and then to the parking garage.  *Id.*  Later that day, Slattery met with employees from the Information Management Section to advise them of Satter's reassignment pending the investigation into possible misconduct.  *Id.* at 6.  He informed them that a third party was being hired to investigate the allegations and that they were required to cooperate with the investigation and tell the truth when asked questions.  *Id.*  He also told them that Satter had been

1  instructed not to contact any DOE employees and that if she attempted to do so, they were
2  to contact him immediately.  *Id.*

3       At approximately 11:00 a.m. on March 13, 2007, Slattery was informed that Satter
4  had allegedly called Ashborn's cell phone since Satter had been escorted out of the
5  building.  *Id.* at 6.  Slattery spoke with South about the incident, and Slattery called Satter
6  and again instructed her not to contact any DOE employees during the reassignment.  *Id.*
7  at 6-7.

8       On April 4, 2007, Slattery spoke with Satter and told her that an investigator had
9  been hired.  Dkt. 28 at 6.  On April 5, 2007, Slattery informed Satter that she was to meet
10  with the investigator the following day to answer some questions.  *Id.*  During this
11  telephone conversation, Satter asked Slattery if she would find out what the allegations
12  against her were at the meeting with the investigator.  *Id.*  According to Satter, Slattery
13  told her that the investigator would have the allegations and some questions for her.  *Id.*
14  After several meetings with the investigator and conversations with Slattery, Satter
15  learned of the allegations against her when she received the investigator's final report and
16  supporting documentation on or about May 26, 2007.  *Id.* at 7-8.  The day before she
17  learned of the allegations, Satter received, by certified mail, notice of a pre-disciplinary
18  "*Loudermill* hearing" set for June 14, 2007.  *Id.* at 8.

19       Satter prepared a twenty-six-page response in preparation for the *Loudermill*
20  hearing in which she responded to the allegations against her as well as accused Slattery
21  of retaliating against her for her involvement in supervising his daughter Kelly Slattery
22  and alleged misuse of public funds, wastefulness, and inefficiency on the part of DOE.
23  Dkt. 29, Exh. 8.

24       The following facts are the recitation of events following Satter's submission of
25  her *Loudermill* response, as they appear in her complaint:

26       Satter, accompanied by her attorney, arrived for the *Loudermill* hearing on June
27  14, 2007.  Dkt. 1 at 14.  Satter saw that Slattery and Reese were present.  *Id.*  According

28

1    to Satter, she knew that because they were present she was not going to receive a fair

2    hearing and she presented a previously prepared resignation letter that was effective at

3    4:00 p.m. on June 15, 2007.  *Id*.  On June 14, 2007, Zehm accepted Satter's resignation

4    letter.  *Id*.  At approximately 10:00 a.m. on June 15, 2007, Satter submitted a notice of

5    rescission of her resignation letter to Zehm.  *Id*. at 15.  At approximately 3:00 p.m. that

6    same day, Satter received a voicemail from Reese stating that Zehm would not permit the

7    rescission of her resignation letter.  *Id*.

**III. DISCUSSION**

**A.    Summary Judgment Standard**

10           Summary judgment is proper only if the pleadings, the discovery and disclosure

11   materials on file, and any affidavits show that there is no genuine issue as to any material

12   fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

13   The moving party is entitled to judgment as a matter of law when the nonmoving party

14   fails to make a sufficient showing on an essential element of a claim in the case on which

15   the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

16   (1986).  There is no genuine issue of fact for trial where the record, taken as a whole,

17   could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec.*

18   *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must

19   present specific, significant probative evidence, not simply "some metaphysical doubt").

20   *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists if

21   there is sufficient evidence supporting the claimed factual dispute, requiring a judge or

22   jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477

23   U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

24   626, 630 (9th Cir. 1987).

25           The determination of the existence of a material fact is often a close question.  The

26   Court must consider the substantive evidentiary burden that the nonmoving party must

27   meet at trial – e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477

28

ORDER - 6

1    U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.  The Court must resolve any factual

2    issues of controversy in favor of the nonmoving party only when the facts specifically

3    attested by that party contradict facts specifically attested by the moving party.  The

4    nonmoving party may not merely state that it will discredit the moving party's evidence at

5    trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W. Elec.*

6    *Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).  Conclusory, nonspecific

7    statements in affidavits are not sufficient, and missing facts will not be presumed.  *Lujan*

8    *v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

9    **B.    Constructive Discharge**

10            A cause of action for wrongful termination in violation of public policy may be

11   based on constructive discharge. *Wahl v. Dash Point Family Dental Clinic, Inc*., 144 Wn.

12   App. 34, 43 (2008) (*citing Syder v. Med. Serv. Corp. of E. Wash.*, 145 Wn.2d 233, 238

13   (2001)). To prevail in a constructive discharge claim, an employee must prove that an

14   employer deliberately made the employee's working conditions intolerable, thereby

15   forcing the employee to resign.  *Sneed v. Barna*, 80 Wn. App. 843, 849 (1996).  "The

16   word 'deliberately' requires a deliberate act of the employer creating the intolerable

17   working condition, without regard to the employer's mental state as to the resulting

18   consequence."  *Id*.

19            "An employee's voluntary resignation obviously will defeat a claim for wrongful

20   termination [based on a constructive discharge theory.]  A resignation is presumed to be

21   voluntary and the claimant bears the burden of introducing evidence to rebut that

22   presumption."  *Molsness v. Walla Walla*, 84 Wn. App. 393, 398 (1996).  To show that a

23   resignation was involuntary, an employee must introduce evidence that the resignation

24   was submitted under duress that was brought on by government action.  *Id*.  An

25   employee's subjective belief that he or she has no choice but to resign is insufficient to

26   show that a resignation was involuntary.  *Id*.  "Rather, the test is an objective one."  *Id*.

27   (quoting *Christie v. United States*, 518 F.2d 584, 587 (Ct. Cl. 1975).  Thus, the inquiry  is

28

whether "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Sneed*, 80 Wn. App. at 849 (1996) (internal quotation marks omitted). A resignation is not rendered involuntary simply because it was submitted to avoid possible termination for cause. *Molsness*, 84 Wn. App. at 398.

DOE maintains that Satter's claim for constructive discharge fails as a matter of law because she voluntarily resigned from her position. Dkt. 60 at 9-10. DOE argues that Satter has failed to meet her burden to show that her resignation was made under duress or was the result of intolerable working conditions such that a reasonable person would have felt forced to resign. Dkt. 74 at 2-5. In its motion, DOE makes the argument that Satter's subjective belief that her working conditions were intolerable is not determinative. Dkt. 60 at 9. In support of this argument, DOE's motion quotes the following language from the *Molsness* opinion:

> Duress is not measured by the employee's subjective evaluation of a situation. Rather, the test is an objective one. While it is possible plaintiff, herself, perceived no viable alternative but to tender her resignation, the record evidence supports [the Civil Service Commission's] finding that plaintiff chose to resign . . . rather than challenge the validity of her proposed discharge for cause. The fact remains, plaintiff *had a choice*. She could stand pat and fight. She chose not to. Merely because plaintiff was faced with an inherently unpleasant situation in that her choice was arguably limited to two unpleasant alternatives does not obviate the voluntariness of her resignation.

Dkt. 60 at 9 (quoting 84 Wn. App. at 398). The court in *Molsness* went on to state that:

> This court has repeatedly upheld the voluntariness of resignations where they were submitted to avoid threatened termination for cause. Of course, the threatened termination must be for good cause in order to precipitate a binding, voluntary resignation. But this "good cause" requirement is met as long as plaintiff fails to show that the [government] knew or believed that the proposed termination could not be substantiated.

84 Wn. App. at 398-99. DOE asserts that Satter, just like the plaintiff in *Molsness*, had a choice to "stand pat and fight" by participating in the *Loudermill* hearing, but chose not to and submitted her resignation instead. Dkt. 60 at 9-10.

1    Under the heading of "constructive discharge, in Satter's opposition to DOE's

2    motion, she states:

3              The only question is whether a reasonable, objective person in
       plaintiff's shoes would have resigned.  When plaintiff's stress reaction to
4      this hostile treatment is considered – her anxiety, depression, inability to
       sleep, and inability to be alone – plaintiff was pushed to the breaking point.
5      On June 14, she "broke."  Finally, she was forced to resign.

6    Dkt. 72 at 12.  In response to DOE's argument that she failed to "stand pat and fight,"

7    Satter asserts that she had no expectation of a fair fight, that is, she had no expectation

8    that the allegations against her would be decided on the merits because of how she had

9    been "abused" for the previous three months.  Dkt. 72 at 14.  Finally, Satter states that her

10   declaration, "coupled with the admissions of [D]efendants Zehm and Slattery that they

11   lacked information to substantiate the threatened termination of [Satter], resolves the

12   issue of voluntariness. [Satter's] resignation was involuntary, and made under duress,

13   because of [D]efendants admitted lack of good cause for expressly threatened

14   termination."  *Id*.

15           Satter argues her resignation is automatically involuntary because DOE

16   "threatened" termination while Zehm and Slattery represented that they did not think

17   termination was necessarily the appropriate disciplinary action warranted by Satter's

18   misconduct.  Dkt. 72 at 14.  The Court disagrees.  The fact that Zehm and Slattery

19   believed that some disciplinary action, although not termination, was the probable result

20   if the *Loudermill* hearing would have occurred, does not mean that DOE was prohibited

21   from warning Satter in the letter she received that termination was a possible result.  Dkt.

22   21 at 56 (letter to Satter from DOE informing her of the *Loudermill* hearing and stating

23   that Zehm was "considering taking disciplinary action against [Satter] up to and including

24   discharge").  The fact that DOE had evidence that it believed supported serious charges of

25   workplace misconduct by Satter is a sufficient basis for Zehm to include the possibility of

26   termination in her notice of the *Loudermill* hearing.  *See* Dkt. 21 at 10-55 (Lacey's

27   investigation report submitted to Zehm).  The fact that Zehm and Slattery believed a less

28

1    severe discipline was most likely appropriate does not change this and does not obviate

2    the voluntariness of Satter's resignation.

3          Next, Satter confuses the objective standard the Court must apply to a constructive

4    discharge claim with one mixed with subjectivity.  When Satter states that she suffered

5    anxiety, depression, and an inability to sleep or be alone, she is speaking about things she

6    subjectively felt and experienced.  *See* Dkt. 72 at 12.  The Court's duty is not to decide if

7    a reasonable person experiencing those things would have felt compelled to resign.

8    Rather, the Court's duty is to decide whether a reasonable person in Satter's position,

9    meaning an employee reassigned to her home with full pay pending the resolution of

10   allegations of work-related misconduct, would have felt forced to resign.  Such an

11   objective standard does not take into account the things Satter was subjectively feeling or

12   experiencing emotionally; it takes into account what a reasonable person would have

13   experienced under the same circumstances.

14         Accordingly, the issue before the Court is whether DOE deliberately created

15   intolerable working conditions such that a reasonable person in Satter's position would

16   have felt forced to resign.  The Court concludes that a reasonable person would not.

17   Washington law provides a standard process for employees in Satter's situation to

18   challenge disciplinary actions by their employer.  Satter chose not to participate in the

19   process.  With legal counsel present, she gave up and resigned before the process had

20   hardly begun.  *See* Dkt. 61-2 at 8-9.  Although she argues that she was forced to give up

21   and resign because of the "abuse" she had suffered for the previous three months during

22   DOE's investigation of the allegations against her and the intimidation she suffered by

23   having Slattery at the *Loudermill* hearing, the Court finds this argument unpersuasive.  As

24   the court stated in *Molsness*, the fact that Satter had a choice between two unpleasant

25   alternatives, stay and fight or face possible disciplinary action including possible

26   termination, does not mean that resignation was her only choice.  *See* 84 Wn. App. at 398.

27   Satter does not show evidence of abuse or retaliation, or any deliberate attempt on the part

28

ORDER - 10

1    of DOE to create an intolerable working condition.  DOE placed Satter on administrative

2    leave with full pay pending the investigation into serious charges of misconduct.  This

3    reassignment is explicitly allowed in DOE's Policy I-70.  Dkt. 68 at 16.  Satter admits

4    that she was afforded with all of her due process rights during DOE's investigation into

5    the charges and the pre-disciplinary process.  *See* Dkt. 61-2 at 21. In addition, contrary to

6    Satter's bare allegations, there is no evidence in the record that DOE violated Policy I-70

7    with regard to the notice of the allegations given to Satter, the lack of tape-recorded

8    interviews, or otherwise.  *See* Dkt. 68 at 14-17 (DOE Executive Policy I-70).  DOE

9    Policy I-70 specifically states that interviews with employees can be transcribed rather

10   than tape-recorded and does not specifically state what type of notice is required to be

11   given to the accused employee.  *Id.*  Indeed, in examining Policy I-70 and the record

12   herein, the Court finds that the evidence before it shows that DOE complied with each

13   step of the policy in conducting its investigation and pre-disciplinary proceedings

14   involving Satter.

15          Accordingly, the Court finds that a reasonable person, under these conditions,

16   would not feel forced to resign.  If Satter had participated in the *Loudermill* hearing and

17   disagreed with the outcome, she could have challenged the disciplinary action, and

18   brought her complaints regarding the investigation, through the proper procedures and, if

19   necessary, through an action for wrongful termination.  However, the Court finds that

20   Satter voluntarily chose to resign instead.  Therefore, because the Court concludes that

21   Satter has failed to meet her burden to show that her resignation was not voluntary, the

22   Court concludes that her claim that she was constructively discharged is without merit.

23   **C.      Wrongful Termination**

24          The tort of wrongful termination in violation of public policy requires a plaintiff to

25   prove four elements: (1) the existence of a clear public policy (the clarity element), (2)

26   that discouraging the conduct in which she engaged would jeopardize the public policy

27   (the jeopardy element), (3) the public-policy-linked conduct caused the dismissal (the

28

1    causation element), and (4) the defendant must not be able to offer an overriding

2    justification for the dismissal. *Wahl*, 145 Wn. App., 41-42.

3         Because the Court has concluded that DOE is entitled to summary judgment on the

4    issue of Satter's constructive discharge claim, it need not reach the elements of her claim

5    for wrongful termination.  However, even if Satter could show that she was constructively

6    discharged, her wrongful termination claim would fail.  The record is clear that DOE had

7    on overriding justification for Satter's alleged "dismissal" in that an investigation was

8    conducted and evidence was found that, according to DOE, supported fifteen of the

9    allegations against her for work-related misconduct.  Satter's assertions about the

10   insufficiency of the investigation are not enough to overcome DOE's justification as she

11   has not produced evidence that DOE's justification regarding her misconduct was a

12   prextext for an actual improper reason for "dismissing" her.  *See Kuyper v. Dep't of*

13   *Wildlife*, 79 Wn. App. 732, 738 (1995) (stating that a "plaintiff cannot create a pretext

14   issue without some evidence that the articulated reason for the employment decision is

15   unworthy of belief").  Therefore, the Court concludes that Satter's wrongful termination

16   claim is without merit as a matter of law.

**IV. ORDER**

17        Therefore, it is hereby

18        **ORDERED** that DOE's motion for partial summary judgment regarding Satter's

19   constructive discharge claim (Dkt. 60) is **GRANTED**.

20        DATED this 10th day of August, 2010.

<br>

_____
BENJAMIN H. SETTLE
United States District Judge

ORDER - 12